## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

EDUARD ZAVALUNOV,                    :        Civil No. 3:19-cv-453
                                     :
          Plaintiff                  :        (Judge Mariani)
                                     :
     v.                              :
                                     :
FEDERAL BUREAU OF PRISONS, *et al.*, :
                                     :
          Defendants                 :

## MEMORANDUM

Plaintiff Eduard Zavalunov ("Zavalunov"), an inmate currently confined at the Allenwood, Low Security Correctional Institution ("LSCI-Allenwood") in White Deer, Pennsylvania, initiated this action pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671, *et seq.* (Doc. 1). Zavalunov also alleges violations of the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, and the Privacy Act, 5 U.S.C. § 552a. (Doc. 25). The matter is proceeding *via* an amended complaint. (*Id.*). Named as Defendants are the Federal Bureau of Prisons ("BOP"), the United States of America, Warden D.K. White, Institution Hearing Program ("IHP") Assistant Arleen Garcia-Haupt, and BOP Director Hugh Hurwitz. Presently pending before the Court is Defendants' motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b) and for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Doc. 35). For the reasons set forth below, the Court will grant the motion.

I.      <u>Motion to Dismiss</u>

A.      Legal Standard

A complaint must be dismissed under FED. R. CIV. P. 12(b)(6), if it does not allege

"enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007).  The plaintiff must

aver "factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct.

1937, 1949, 173 L. Ed. 2d 868 (2009).

"Though a complaint 'does not need detailed factual allegations, . . . a formulaic

recitation of the elements of a cause of action will not do.'" *DelRio-Mocci v. Connolly Prop.*

*Inc.*, 672 F.3d 241, 245 (3d Cir. 2012) (citing *Twombly*, 550 U.S. at 555).  In other words,

"[f]actual allegations must be enough to raise a right to relief above the speculative level."

*Covington v. Int'l Ass'n of Approved Basketball Officials*, 710 F.3d 114, 118 (3d Cir. 2013)

(internal citations and quotation marks omitted).  A court "take[s] as true all the factual

allegations in the Complaint and the reasonable inferences that can be drawn from those

facts, but . . . disregard[s] legal conclusions and threadbare recitals of the elements of a

cause of action, supported by mere conclusory statements." *Ethypharm S.A. France v.*

*Abbott Laboratories*, 707 F.3d 223, 231, n.14 (3d Cir. 2013) (internal citations and quotation

marks omitted).

> *Twombly* and *Iqbal* require [a district court] to take the following three steps to determine the sufficiency of a complaint:  First, the court must take note of the elements a plaintiff must plead to state a claim.  Second, the court should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth.  Finally, where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief.

*Connelly v. Steel Valley Sch. Dist.*, 706 F.3d 209, 212 (3d Cir. 2013).

"[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged - but it has not show[n] - that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (internal citations and quotation marks omitted).  This "plausibility" determination will be a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

However, even "if a complaint is subject to Rule 12(b)(6) dismissal, a district court must permit a curative amendment unless such an amendment would be inequitable or futile." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 245 (3d Cir. 2008).

> [E]ven when plaintiff does not seek leave to amend his complaint after a defendant moves to dismiss it, unless the district court finds that amendment would be inequitable or futile, the court must inform the plaintiff that he or she has leave to amend the complaint within a set period of time.

*Id.*

### B.    Allegations of the Amended Complaint

Zavalunov contends that he is a "stateless person" and that he was improperly referred to Immigration and Customs Enforcement ("ICE") for deportation proceedings.

3

(Doc. 25, pp. 6-7).  He alleges that a detainer was negligently lodged against him without the required charging document, warrant, or deportation order.  (*Id.* at pp. 7, 9, 11).  Zavalunov avers that the ICE detainer precludes him from consideration for and participation in a Residential Reentry Center ("RRC"), and early release eligibility upon successful completion of the Residential Drug Abuse Treatment Program ("RDAP").  (*Id.* at p. 8).  He further alleges that Defendants violated the Freedom of Information Act and Privacy Act by withholding documents responsive to his FOIA request.  (*Id.* at pp. 1, 2, 13, 14).

For relief, Zavalunov seeks an injunctive order for LSCI-Allenwood not to honor a detainer request without appropriate documentation, he requests that Defendants cease withholding documents responsive to his FOIA request, and he requests damages and a sentence reduction.  (*Id.* at pp. 14-15).

C.    Discussion

To the extent that Zavalunov seeks recovery against the individual Defendants in their official capacities, these claims are barred by the doctrine of sovereign immunity.  "It is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction." *United States v. Mitchell*, 463 U.S. 206, 212 (1983).  "Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." *FDIC v. Meyer*, 510 U.S. 471, 475 (1994). "Official-capacity suits . . .

'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985) (quoting *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 690 n. 55 (1978)).  Thus, any claims against the individual Defendants in their official capacities are actually claims against the United States and are barred absent a waiver of sovereign immunity.  Because no waiver of immunity exists for such claims, the Court will grant Defendants' motion to dismiss the claims for money damages against the individual Defendants sued in their official capacities.

## II.   Motion for Summary Judgment

### A.   Legal Standard

Through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact."  FED. R. CIV. P. 56(a).  "As to materiality, . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  Once such a showing has been made, the non-moving party must offer specific facts contradicting those averred by the movant to establish a

genuine issue of material fact.  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990).

Therefore, the non-moving party may not oppose summary judgment simply on the basis of

the pleadings, or on conclusory statements that a factual issue exists.  *Anderson*, 477 U.S.

at 248.  "A party asserting that a fact cannot be or is genuinely disputed must support the

assertion by citing to particular parts of materials in the record . . . or showing that the

materials cited do not establish the absence or presence of a genuine dispute, or that an

adverse party cannot produce admissible evidence to support the fact."  FED. R. CIV. P.

56(c)(1)(A)-(B).  In evaluating whether summary judgment should be granted, "[t]he court

need consider only the cited materials, but it may consider other materials in the record."

FED. R. CIV. P. 56(c)(3).  "Inferences should be drawn in the light most favorable to the non-

moving party, and where the non-moving party's evidence contradicts the movant's, then

the non-movant's must be taken as true."  *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974

F.2d 1358, 1363 (3d Cir.1992), *cert. denied* 507 U.S. 912 (1993).

However, "facts must be viewed in the light most favorable to the nonmoving party

only if there is a 'genuine' dispute as to those facts."  *Scott v. Harris*, 550 U.S. 372, 380, 127

S. Ct. 1769, 1776, 167 L. Ed. 2d 686 (2007).  If a party has carried its burden under the

summary judgment rule,

> its opponent must do more than simply show that there is some metaphysical
> doubt as to the material facts.  Where the record taken as a whole could not
> lead a rational trier of fact to find for the nonmoving party, there is no genuine
> issue for trial.  The mere existence of some alleged factual dispute between

the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

*Id.* (internal quotations, citations, and alterations omitted).

## B.    Statement of Undisputed Facts

Zavalunov is a federal inmate designated to LSCI-Allenwood. (Doc. 42, Statement of Material Facts, ¶ 1; Doc. 48, Counterstatement of Material Facts, ¶ 1). Zavalunov is serving a forty-month term of imprisonment for conspiracy to commit mail fraud, wire fraud, and healthcare fraud. (Doc. 42 ¶ 2; Doc. 48 ¶ 1).

### 1.    *ICE Detainer*

On July 24, 2017, Zavalunov was designated to LSCI-Allenwood, in part, to participate in the on-site Institution Hearing Program. (Doc. 42 ¶ 3). The IHP is a coordinated effort between the BOP, ICE, and the Executive Office for Immigration Review ("EOIR"), to provide for deportation, exclusion, or removal proceedings to sentenced aliens prior to sentence expiration. (*Id.* at ¶ 4). This process allows ICE to effect deportation removal immediately upon the completion of an inmate's term of imprisonment. (*Id.* at ¶ 5). When a program participant is designated to LSCI-Allenwood, the unit team notifies ICE and ICE interviews the inmate within thirty (30) days to determine IHP eligibility. (*Id.* at ¶ 6).

Pursuant to BOP Program Statement 5800.15, Correctional Systems Manual, warrants are not required when ICE files a federal detainer, and ordinarily, ICE will use their Immigration Detainer form.  (*Id.* at ¶ 7).  The BOP then generates a Detainer Action Letter to memorialize the receipt, acknowledgment, and verification of an ICE detainer.  (*Id.*).

On September 7, 2017, an ICE Immigration Officer provided the BOP with a Warrant for Arrest of Alien and Immigration Detainer-Notice of Action pertaining to Zavalunov.  (*Id.* at ¶ 8).  These documents indicated that there was probable cause to believe that Zavalunov is removable from the United States based upon the pendency of ongoing removal proceedings against him.  (*Id.*).  The detainer instructed the BOP to notify ICE before Zavalunov is released from custody.  (*Id.* at ¶ 9).

Zavalunov states that between July 24, 2017 and October 13, 2017, Defendant Garcia-Haupt transmitted his personal information to ICE without his knowledge or consent.  (Doc. 48 ¶ 2).  Zavalunov asserts that between July 24, 2017 and October 13, 2017, he was never subject to an ICE detainer, removal order, or arrest warrant.  (*Id.* at ¶¶ 2, 7, 8).

Defendants aver that on September 7, 2017, an ICE Immigration Officer provided the BOP with a "Warrant for Arrest of an Alien" and "Immigration Detainer-Notice of Action" pertaining to Zavalunov.  (Doc. 42 ¶ 8).  The documents indicated that there was probable cause to believe that Zavalunov is removable from the United States based upon the

pendency of ongoing removal proceedings against him.  (*Id.*).  The detainer instructed the

BOP to notify ICE before Zavalunov is released from custody.  (*Id.* at ¶ 9).

On October 16, 2017, LSCI-Allenwood issued a Detainer Action Letter memorializing

the filing of the detainer and noted that Zavalunov was tentatively scheduled to be released

on June 18, 2020.  (*Id.* at ¶ 10).  The Immigration Detainer served on Zavalunov notified him

that the Department of Homeland Security ("DHS") placed the immigration detainer on him

and served as notice to a law enforcement agency that DHS intends to assume custody of

him after his release from custody.  (*Id.* at ¶ 11).  On or about October 16, 2017, Zavalunov

received a copy of the Detainer Action Letter.  (Doc. 48 ¶ 4).  Zavalunov asserts that ICE

Officials fabricated the documents in his immigration matter.  (*Id.* at ¶¶ 11-12).

When an immigration hearing is conducted and concluded, ICE or EOIR staff will

provide a copy of the hearing decision to institution staff and to the inmate.  (Doc. 42 ¶ 12).

If EOIR issues a delayed decision, a copy of the order will be mailed to institution staff and

the inmate.  (*Id.* at ¶ 13).  When removal is not ordered at the conclusion of the

administrative proceeding, a written copy of the final order is placed in the inmate's central

file.  (*Id.* at ¶ 14).  If removal is ordered, a copy of the removal order is placed in the

inmate's central file.  (*Id.* at ¶ 15).  If ICE declines to accept custody of the individual and

cancels the detainer, LSCI-Allenwood will complete a new Detainer Action Letter to remove

the immigration detainer and release the inmate at the expiration of his sentence if no other detainer is on file.  (*Id.* at ¶ 16).

A deportable alien is unqualified for the RDAP because he cannot participate in the transitional drug abuse treatment component of the program.  (*Id.* at ¶ 17).  The non-residential drug abuse program is available for deportable aliens.  (*Id.* at ¶ 18).

On January 4, 2018, Zavalunov was determined to be unqualified to participate in the RDAP program due to his status as a deportable alien.  (*Id.* at ¶ 19).

## 2.   *FTCA Claim*

On March 11, 2019, Zavalunov filed Administrative Tort Claim Number TRT-NER-2019-03028 with the BOP Northeast Regional Office requesting $5,000,000.00 for emotional distress associated with an existent ICE detainer and the resultant inability to be classified as a minimum-security inmate eligible for RRC and RDAP consideration.  (*Id.* at ¶ 20).  Zavalunov alleged that the BOP negligently maintained records.  (*Id.* at ¶ 21).  On March 19, 2019, the Regional Office denied the claim, finding that Zavalunov failed to allege a physical injury actionable under the FTCA, per 28 U.S.C. §§ 1346(b)(2) and 2672.  (*Id.* at ¶ 22).  The Regional Office also noted that the office never received a prior claim from Zavalunov regarding this matter.  (*Id.*).  Zavalunov was informed that he had six (6) months from the March 19, 2019 denial to file suit in federal district court.  (*Id.* at ¶ 23).  On March 14, 2019, Zavalunov filed the instant complaint in federal court, which was three (3) days

after the administrative filing and prior to receiving the March 19, 2019 agency response, in violation of 28 U.S.C. § 2675(a).  (*Id.* at ¶ 24).

### 3.    *FOIA Claim*

Zavalunov's immigration case began with the issuance and filing of a Notice to Appear dated June 27, 2019.  (*Id.* at ¶ 25).  Zavalunov will be brought before the Immigration Court when the Court schedules a hearing.  (*Id.*).

On December 16, 2019, Zavalunov was personally served with a DHS evidence packet.  (*Id.* at ¶ 26).  Lee-Anne Eichensehr is a Government Information Specialist employed by the BOP for the Northeast Regional Office.  (*Id.* at ¶ 27).  As part of Eichensehr's duties, she coordinates responses to the Freedom of Information Act requests made to the BOP for records maintained in the Northeast Region.  (*Id.* at ¶ 28).  Eichensehr is familiar with the procedures adhered to by the BOP in responding to requests for information from files received pursuant to the provisions of FOIA and 5 U.S.C. § 552a, the Privacy Act of 1974.  (*Id.* at ¶ 29).  Eichensehr has access to all of the FOIA and Privacy Act files of the requests processed in the Northeast Regional Office.  (*Id.* at ¶ 30).  As part of Eichensehr's duties, she is also familiar with the procedures followed by the BOP in responding to requests for information from its files pursuant to FOIA and the Privacy Act. (*Id.* at ¶ 31).  Eichensehr also provides assistance with FOIA litigation.  (*Id.* at ¶ 32).

On July 31, 2018, Zavalunov completed a FOIA request seeking only a copy of the detainer from ICE dated October 16, 2017.  (*Id.* at ¶¶ 33, 36).  Zavalunov asserts that he filed a FOIA request seeking all documents related to any immigration matters.  (Doc. 48 ¶ 12).  On August 6, 2018, the BOP sent a determination letter releasing two pages of responsive documents, and explained the exemptions that justified the redactions.  (Doc. 42 ¶¶ 34, 36).  The determination letter advised Zavalunov that he had ninety (90) days to file an administrative appeal.  (*Id.* at ¶ 37).  Zavalunov did not appeal.  (*Id.* at ¶ 38).

Defendants maintain that there is no viable Privacy Act matter in issue.  (*Id.* at ¶ 35). In the complaint, Zavalunov alleges that he suffered harm because the BOP failed to correct his inmate records.  (*Id.*).  Defendants contend that, in the past, this would have sounded as a Privacy Act cause of action; however, law enforcement agencies such as BOP were authorized by statute to exempt certain record systems from certain requirements of the Privacy Act § 552a.  (*Id.*).  Inmate records maintained by the BOP have been exempted from the Privacy Act's accuracy and amendment requirements and from its damages provision.  (*Id.*).

Zavalunov raised FOIA claims for the first time in the amended complaint filed on October 23, 2019.  (*Id.* at ¶ 39).  On November 1, 2019, Eichensehr was asked to provide a declaration concerning the FOIA claims Zavalunov raised in his amended complaint.  (*Id.* at ¶ 40).

Under the FOIA, an agency has a duty to conduct a reasonably adequate search for responsive records. (*Id.* at ¶ 41). To be adequate, a search must be reasonably calculated to uncover all responsive documents. (*Id.* at ¶ 42). The question is not whether there might exist any other documents possibly responsive to the request, but rather whether the search for those documents was adequate. (*Id.*). To demonstrate the adequacy of its search, the agency must provide a reasonably detailed declaration, setting forth the search terms and the type of searches performed. (*Id.* at ¶ 43). The FOIA declarant must be able to attest that all areas reasonably likely to contain responsive documents were searched and there are no remaining locations to search from which responsive documents are reasonably likely to be found. (*Id.* at ¶ 44). An agency must construe FOIA requests liberally and cannot limit its search to only some record systems if there are others that are likely to turn up the information requested. (*Id.* at ¶ 45).

On August 2, 2018, the Northeast Regional Office received Zavalunov's FOIA request. (*Id.* at ¶ 46). Also on August 2, 2018, the Northeast Regional office forwarded the request, *via* email, to LSCI-Allenwood requesting documents. (*Id.*). In the request, Zavalunov asked for "[a] copy of the detainer request from the Immigration & Customs Enforcement on or about October 16, 2017." (*Id.* at ¶ 47). The next day, a case manager searched Zavalunov's Inmate Central File. (*Id.* at ¶ 48). The case manager reported that he found the document sought following a fifteen (15) minute search of the file. (*Id.*).

13

Zavalunov supplied the following information needed to conduct the search: date, subject matter of the record, and the type of records sought.  (*Id.*).  Because of the nature of prison records and the manner in which the BOP stores information, Zavalunov's name and federal register number were also relevant search terms.  (*Id.* at ¶ 49).

An inmate's Central File is in paper format and is generally maintained at the inmate's current institution.  (*Id.* at ¶ 50).  The files are stored alphabetically by inmate name in secure, fireproof cabinets in the unit team offices of the housing unit where the inmate lives.  (*Id.* at ¶ 51).  At all relevant times, Zavalunov was housed at LSCI-Allenwood.  (*Id.*).

When the October 16, 2017 detainer concerning Zavalunov was found, the BOP had searched all areas reasonably likely to render records responsive to Zavalunov's request.  (*Id.* at ¶ 52).  There were no other areas to be searched that were reasonably likely to produce responsive documents.  (*Id.* at ¶ 53).

The BOP's FOIA Xpress database reflects that the two-page record was forwarded for processing to a paralegal in the Office of Regional Counsel in Philadelphia.  (*Id.* at ¶ 54).  The request was processed, and, on August 6, 2018, the request was approved by BOP Attorney John E. Wallace.  (*Id.* at ¶ 55).  On August 6, 2018, the determination letter and responsive records were sent to Zavalunov.  (*Id.* at ¶ 56).

Zavalunov requested information about himself contained in the BOP systems of records.  (*Id.* at ¶ 57).  The Privacy Act generally provides individuals a right of access to

records about themselves in agency records unless a Privacy Act exemption applies. (*Id.* at ¶ 58). Defendants maintain that the information Zavalunov seeks about himself is exempt from disclosure under the Privacy Act. (*Id.* at ¶ 59). Information about third parties contained in agency records cannot be provided to Zavalunov in the absence of "the prior written consent of [ ] the individual to whom the record pertains . . . " (*Id.* at ¶ 60). The FOIA is the sole avenue of relief available to Zavalunov. (*Id.* at ¶ 61). The records responsive to Zavalunov's request were processed to achieve maximum disclosure consistent with FOIA. (*Id.* at ¶ 62). Every effort was made to provide Zavalunov with all reasonably segregable nonexempt information in the responsive records. (*Id.*). No reasonably segregable nonexempt portions were withheld from Zavalunov. (*Id.* at ¶ 63). The BOP relied on exemption (b)(6), which exempts from disclosure "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy . . . . " (*Id.* at ¶ 65). All information that applies to a particular person falls within the scope of exemption 6. (*Id.* at ¶ 66). Subpart (b)(6) was invoked as authority for the redaction or withholding of the identifiers of third parties mentioned in the agency records released to Zavalunov. (*Id.*). Each time exemption (b)(6) was used, the privacy interest of the third-party individual was weighed against the public's interest, which is an interest in understanding the operations of the BOP. (*Id.* at ¶ 67). Defendants assert that the amended complaint does not identify a specific public interest. (*Id.* at ¶ 68). The

redactions of names in these records reveals nothing to the public about agency operations. (*Id.* at ¶ 69).

Courts have concluded that subpart (b)(6) protects the identity information of certain law enforcement officers, and BOP staff have been found to have substantial privacy expectations in their names and addresses. (*Id.* at ¶ 71). Exemption (b)(6) was used on the two (2) pages released in FOIA Request 2018-06492. (*Id.* at ¶ 73). This exemption was applied to protect staff identities. (*Id.*).

Defendants maintain that the BOP properly employed exemption 7 in response to Zavalunov's FOIA request. (*Id.* at ¶ 74). Exemption 7 protects from disclosure "records or information compiled for law enforcement purposes," but only to the extent that disclosure would cause an enumerated harm. (*Id.* at ¶ 75). In order to withhold documents under exemption 7, the agency must, as a preliminary matter, make a threshold showing demonstrating that the records were compiled for a law enforcement purpose. (*Id.* at ¶ 76). To show that documents were compiled for law enforcement purposes, the BOP need only establish a rational nexus between a record and one of the agency's law enforcement duties. (*Id.* at ¶ 77). The BOP's primary responsibility is to protect all persons charged with or convicted of offenses against the United States, as well as the law enforcement detention staff and the community. (*Id.* at ¶ 78). Defendants assert that the nature and contents of the Central File show that the requested records relate to a law enforcement purpose. (*Id.*

16

at ¶ 79).  The records contain presentence investigations reports; the sentencing judge's statement of reasons; other sentence and detainer data; security classification materials; background check materials for visitors; conduct, work, and quarters reports; release processing; and general correspondence.  (*Id.* at ¶ 80).  Defendants aver that the documents in Zavalunov's Central File were generated as part of BOP's law enforcement mission of protecting inmates, staff, and the community.  (*Id.* at ¶ 82).  Additionally, there is a direct relationship between these records and the BOP's duty to ensure the safety of inmates, staff, and the community and its professional decisions as to how to protect inmates.  (*Id.* at ¶ 83).

Defendants state that, with a few exceptions, the responsive records at issue in this case were compiled for law enforcement purposes within the scope of exemption 7.  (*Id.* at ¶ 84).  Exemption (b)(7)(C) exempts from disclosure "records or information compiled for law enforcement purposes [when disclosure] could reasonably be expected to constitute an unwarranted invasion of personal privacy."  (*Id.* at ¶ 85).  When determining whether redacting or withholding records under exemption 7(C) is proper, the privacy interests at stake are weighed against the public interest in disclosure of the information.  (*Id.* at ¶ 86).  To overcome a legitimate privacy interest, a requestor must: (1) demonstrate the public interest is a significant one, and more than having the information for its own sake; and, (2) show the information is likely to advance that interest.  (*Id.* at ¶ 87).  Exemption 7(C)'s

17

privacy protections extend to personally identifiable information that appears in law enforcement records.  (*Id.* at ¶ 88).  Exemption 7(C) protects the privacy interests of all individuals mentioned in law enforcement records, including, but not limited to, investigators, suspects, witnesses, and bystanders.  (*Id.* at ¶ 89).  Exemption 7(C) authorizes the withholding of the photographs, names, and addresses of private individuals appearing in files unless release is necessary in order to confirm or refute compelling evidence that the agency is engaged in illegal activity.  (*Id.*).  In order for the release of records to serve a public interest, the information must shed light on an agency's performance of its statutory duties.  (*Id.* at ¶ 90).  Names, likenesses, and other identifying information of most individuals rarely contribute to this public interest or knowledge of how an agency operates.  (*Id.* at ¶ 91).  If release of the records serves the public interest, a requester must also demonstrate the public interest is both significant and compelling enough to overcome legitimate privacy interests.  (*Id.* at ¶ 92).  If illegal or improper activities are alleged, a requester must produce meaningful evidence—more than a bare suspicion—that would cause a reasonable person to believe the government had engaged in impropriety.  (*Id.* at ¶ 93).

Exemption 7(C) was used on the two (2) pages released in FOIA Request 2018-0649292.  (*Id.* at ¶ 94).  This exemption was applied to protect staff identities.  (*Id.*).  The BOP reviewed the two (2) pages of the responsive pages to determine whether any

reasonably segregable portions of the record could be released.  (*Id.* at ¶¶ 95-96).

Nonexempt information must be released unless that information is inextricably intertwined

with exempt portions.  (*Id.* at ¶ 97).

Defendants assert that, after the applications of the exemptions, the only surviving,

nonexempt information was essentially a disjointed set of words, phrases, and sentences

that have minimal or no information content.  (*Id.* at ¶ 98).

## C.    Discussion

### 1.    *Failure to Comply with 28 U.S.C. § 2675(a)*

The FTCA allows federal prisoners to pursue lawsuits against the United States in an

effort to recover for personal injuries sustained during confinement by reason of negligence

of government employees.  *See Berman v. United States*, 205 F. Supp. 2d 362 (M.D. Pa.

2002) (citing *United States v. Muniz*, 374 U.S. 150 (1963); 28 U.S.C. §1346(b)).  The

primary purpose of the FTCA is to "remove sovereign immunity of the United States from

suits in tort, and with certain specific exceptions, to render the Government liable in tort as a

private individual would be under like circumstances."  *Id.* (quoting *Richards v. United

States*, 369 U.S. 1, 6 (1962); 28 U.S.C. § 1346(b)).

As a prerequisite to suit under the FTCA, a claim must first be presented to the

federal agency and be denied by the agency.  The FTCA provides:

An action shall not be instituted against the United States for money damages
for injury or loss of property or personal injury . . . unless the claimant shall

have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing and sent by certified or registered mail.

28 U.S.C. § 2675(a).  Thus, prior to commencing an FTCA action against the United States in federal court, a plaintiff must "first present[ ] the claim to the appropriate Federal agency" and receive a final denial "by the agency in writing and sent by certified or registered mail." 28 U.S.C. § 2675(a).  "The statutory language is clear that a court does not have jurisdiction before administrative remedies have been exhausted, and a court must dismiss any action that is initiated prematurely."  *Wilder v. Luzinski*, 123 F. Supp. 2d 312, 313 (E.D. Pa. 2000) (citing *McNeil v. United States*, 508 U.S. 106, (1993); *Wujick v. Dale & Dale*, 43 F.3d 790, 793-94 (3d Cir. 1994)).

Moreover, a claimant must abide by the strict time requisites codified in 28 U.S.C. § 2401(b) or its tort claim under the FTCA will be "forever barred."  *See Bialowas v. United States*, 443 F.2d 1047, 1049 (3d Cir. 1971).  To sue the United States in district court and avoid violating the FTCA's express statute of limitations, a plaintiff must present the tort claim "in writing to the appropriate Federal agency within two years after such claim accrues . . . ."  28 U.S.C. § 2401(b); *see also Bialowas*, 443 F.2d at 1049.  Section 2401's "time bar is strictly construed."  *Brown v. Camden County Counsel*, 2010 U.S. App. LEXIS 9826, *6 (3d Cir. 2010) (citing *Livera v. First Nat. State Bank of N.J.*, 879 F.2d 1186, 1195 (3d Cir. 1989)).

On March 11, 2019, Zavalunov filed Administrative Tort Claim Number TRTNER-2019-03028, with the BOP Northeast Regional Office requesting $5,000,000.00 for emotional distress associated with an existent ICE detainer and the resultant inability to be classified as a minimum-security inmate eligible for RRC and RDAP consideration.  (Doc. 42 ¶ 20).  The claim alleged that the BOP negligently maintained records.  (*Id.* at ¶ 21).  On March 14, 2019, Zavalunov filed his complaint in this action.  (*Id.* at ¶ 24).  On March 19, 2019, the Regional Office denied his claim and found that he failed to allege a physical injury actionable under the FTCA, per 28 U.S.C. §§ 1346(b)(2) and 2672.  The Regional Office also noted that the office never received a prior claim from Zavalunov regarding this matter.  (*Id.* at ¶ 22).  Zavalunov was informed that he had six (6) months from the March 19, 2019, denial to file suit in federal district court.  (*Id.* at ¶ 23).

As is apparent from the record before the Court, Zavalunov filed the instant complaint three (3) days after filing his administrative tort claim and before the denial of the claims, in violation of 28 U.S.C. § 2675(a).  Therefore, Defendants are entitled to summary judgment on the FTCA claim.  *See* 28 U.S.C. § 2675(a); *McNeil v. United States*, 508 U.S. 106, 111-12, 113 S.Ct. 1980 (1996) (holding that a court is without jurisdiction to rule on a prematurely filed FTCA action even if an agency denies the related administrative claim soon after the federal lawsuit is filed); *see also Shelton v. Bledsoe*, 775 F.3d 554, 569 (3d

Cir. 2015) (finding that the district court properly dismissed FTCA claim where the plaintiff filed federal action prior to exhausting administrative remedies).

> **2.**     *Failure to Establish More Than a De Minimis Physical Injury Bars a FTCA Claim*

Zavalunov seeks an award of monetary damages from the United States under the FTCA.  Under § 1346(b)(1) of the FTCA, federal district courts generally have jurisdiction over tort claims against the United States for "injury or loss of property, or personal injury or death" caused by the negligence of a federal employee, if the claim would give rise to liability in the state where the tort occurred.  28 U.S.C. § 1346(b)(1).  However, as part of the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997, section 1346(b)(2) of the FTCA precludes inmate tort actions against the United States for "mental or emotional injury suffered while in custody without a prior showing of physical injury . . . "  28 U.S.C. § 1346(b)(2).  Similarly, § 1997e(e) of title 42 provides: "No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury."  42 U.S.C. § 1997e(e).  More than a *de minimis* physical injury must be alleged as a predicate to allegations of mental or emotional injury.  *See Mitchell v. Horn*, 318 F.3d 523, 536 (3d Cir. 2003).

Zavalunov asserts that he suffered emotional distress due to the alleged improperly lodged detainer.  He further avers that due to the detainer, he remained housed at LSCI-

Allenwood, fell on uneven pavement, and sustained bruises.  (Doc. 48 ¶ 14).  Zavalunov

has not alleged nor pointed to any evidence in the record that he required any medical

treatment after the alleged slip and fall, or that this was more than an isolated instance.

Zavalunov has failed to present any evidence that he suffered more than a *de minimis* injury

as a result of allegedly falling on the uneven pavement, as required for a predicate to

emotional injury.  *See Mitchell*, 318 F.3d at 534-36.  Consequently, the United States is

entitled to an entry of judgment in its favor based on the FTCA claim based on Zavalunov's

failure to meet the physical injury requirements of 28 U.S.C. § 1346(b)(2).

### 3. *The ICE Detainer was Processed in Accordance with BOP Regulations*

On July 24, 2017, Zavalunov was designated to LSCI-Allenwood to enable him to

participate in the Institution Hearing Program.  (Doc. 42 ¶ 3).  As stated, the IHP is a

coordinated effort between the BOP, ICE, and Executive Office for Immigration Review, to

provide deportation, exclusion, or removal proceedings to sentenced aliens.  (*Id.* at ¶ 4).

BOP Program Statement 5800.15, Correctional Systems Manual, expressly states

that "[w]arrants are not required when . . . ICE files a Federal detainer.  Ordinarily, . . . ICE

will use their Immigration Detainer form."  (Doc. 42 ¶ 7; Doc. 46, p. 67, BOP Program

Statement 5800.15, Ch. 6 § 604).  The record reflects that on September 7, 2017, an ICE

Immigration Officer provided the BOP with a Warrant for Arrest of Alien and Immigration

Detainer-Notice of Action pertaining to Zavalunov.  (Doc. 42 ¶ 8; Doc. 46, pp. 4-6,

23

Immigration Detainer-Notice of Action; Doc. 46, p. 7, Warrant for Arrest of Alien). These documents indicated that there was probable cause to believe that Zavalunov is removable from the United States based on the pendency of ongoing removal proceedings against him. (*Id.*). The detainer instructed the BOP to notify ICE before Zavalunovf is released from BOP custody, and that the DHS intends to assume custody of Zavalunov after his release from BOP custody. (Doc. 42 ¶¶ 9, 11; Doc. 46, p. 4).

In accordance with BOP Program Statement 5800.15, Correctional Systems Manual, the BOP then generated a Detainer Action Letter to memorialize the filing of the detainer. (Doc. 46, p. 66, BOP Program Statement 5800.15, Ch. 6 § 603). On October 16, 2017, LSCI-Allenwood issued a Detainer Action Letter noting that a detainer was filed against Zavalunov because DHS determined that probable cause exists to believe that he is a removable alien. (Doc. 42 ¶ 10; Doc. 46, p. 9, Detainer Action Letter). The Detainer Action Letter also indicated that Zavalunov was tentatively scheduled to be released on June 18, 2020. (*Id.*). Zavalunov acknowledges that he received a copy of the Detainer Action Letter on or about October 16, 2017. (Doc. 48 ¶ 4).

The undisputed evidence establishes that the BOP properly processed the ICE detainer in accordance with its policies. Zavalunov has failed to present any evidence in support of his claim that the ICE detainer was fraudulently and illegally placed in his file.[1]

---

[1]    In his underling criminal case, Zavalunov filed a motion to correct his presentence report wherein he similarly argued that he is a non-deportable alien, and he requested an amendment to his

24

The Court will grant Defendants' motion for summary judgment with respect to any claim that the ICE detainer was improperly issued or processed.

### 4.    The *Heck* Doctrine Bars Zavalunov's Defective Detainer Claim

"[H]arm caused by actions whose unlawfulness would render a conviction or sentence invalid" is not cognizable in a civil rights action, unless the conviction or sentence has been "reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." *Heck v. Humphrey*, 512 U.S. 477, 486-87 (1994). This is known as the "favorable termination rule." *Id.* *Heck* applies to claims involving monetary damages as well as those seeking equitable and declaratory relief. *See Wilkinson v. Dotson*, 544 U.S. 74, 81-82 (2005). It also applies detainer actions. *See, e.g., Jackson v. Alt*, 236 F. App'x 850 (3d Cir. 2007); *McBride v. O'Brien*, 646 F. App'x 277, 278 (3d Cir. 2016) ("McBride seeks damages under § 1983 for his incarceration resulting from the issuance of a probation violation detainer. To the extent that McBride alleges that his confinement on the detainer violates federal law, a favorable outcome would necessarily demonstrate the invalidity of his detention.").

---

presentence report to indicate that he is non-deportable. *United States v. Zavalunov*, No. 1:14-cr-773 (S.D.N.Y.), Doc. 432. Zavalunov argued that prison officials at LSCI-Allenwood incorrectly believed that he is a deportable alien, which precluded his eligibility for rehabilitation programs. *Id.* On December 17, 2018, the United States District Court for the Southern District of New York denied the motion and found that Zavalunov "provide[d] no support for his argument that the PSR contains misinformation as to his immigration status." *Id.*

Zavalunov alleges that the ICE detainer is invalid and was negligently lodged against him without a charging document, warrant, or deportation order.  Zavalunov has not established that his claims relating to his removal proceedings have been called into question by the granting of a federal habeas petition or by any of the other methods described in *Heck*.  Because Zavalunov has not established that the pre-requisites of *Heck* have been met, Defendants' motion for summary judgment will be granted with respect to the alleged defective detainer claim.

5.  *18 U.S.C § 3621(e)(2)(B) Early Release Benefit and RDAP*

18 U.S.C. § 3621 directs the Bureau of Prisons to "make available appropriate substance abuse treatment for each prisoner the Bureau determines has a treatable condition of substance addiction or abuse."  18 U.S.C. § 3621(b).  Under 18 U.S.C. § 3621, eligible prisoners are able to participate in substance abuse programming and treatment available while incarcerated in federal institutions.  18 U.S.C. § 3621(b)(5), (e).  An inmate may be "eligible" for a program such as the RDAP if he is (1) "determined by the Bureau of Prisons to have a substance abuse problem," and (2) "willing to participate in a residential substance abuse treatment program." 18 U.S.C. § 3621(e)(5)(B).  As an incentive for prisoners to successfully complete a treatment program, Congress allowed for a potential one-year sentence reduction, at the discretion of prison officials.  18 U.S.C. § 3621(e)(2)(A), (B).

There are three essential components to the RDAP program.  The first component is a residential unit-based component.  28 C.F.R. § 550.53(a)(1).  This component is comprised of a course of individual and group activities provided by a team of Drug Abuse Treatment Specialists and the Drug Abuse Program Coordinator inside the prison in a separate treatment unit apart from the general prison population.  *Id.*  Upon successful completion of the residential unit-based component, some inmates may be referred to a second component of this program.  During this second phase of the RDAP program, inmates are given counseling support while they transition back into general population.  28 C.F.R. § 550.53(a)(2).  The final phase of the RDAP program is the community Transitional Drug Abuse Treatment program.  28 C.F.R. § 550.53(a)(3).  Inmates who have completed the unit-based program and follow-up treatment, and are transferred to community confinement, must successfully complete community-based drug abuse treatment in a community-based program in order to graduate from the RDAP program.  *Id.*  For an inmate to successfully complete all components of RDAP the prisoner must participate in the community-based programming.  28 C.F.R. § 550.56(a).  Throughout the course of this treatment, prison officials exercise broad discretion in making RDAP programming decisions.

A deportable alien is unqualified for the RDAP because he cannot participate in the Transitional Drug Abuse Treatment component of the program.  Pursuant to 28 C.F.R. §

550.55(b)(1), ICE detainees are not eligible for early release.  Therefore, because an ICE detainee is not eligible for early release and cannot be transferred to community confinement, they cannot participate in the Transitional Drug Abuse Treatment component of the RDAP.

The record reflects that on September 7, 2017, an ICE Immigration Officer provided the BOP with a Warrant for Arrest of Alien and Immigration Detainer-Notice of Action indicating that there was probable cause to believe that Zavalunov is removable from the United States based upon the pendency of ongoing removal proceedings against him. (Doc. 46, pp. 4-7).  The record further reflects that on January 4, 2018, Zavalunov was determined to be unqualified to participate in the RDAP due to his status as a deportable alien.  (Doc. 46, p. 125).  Zavalunov was properly excluded from the RDAP because inmates with an ICE detainer cannot participate in the community treatment program and consequently cannot be eligible for early release.  *See* BOP Program Statement 5331.02 § 7(a), https://www.bop.gov/policy/progstat/5331_002.pdf (last visited April 27, 2020); BOP Program Statement 7310.04 § 10(f), https://www.bop.gov/policy/progstat/7310_004.pdf (last visited April 27, 2020).  Although Zavalunov is not eligible for the residential drug abuse program, he has not been precluded from participation in the non-residential drug abuse program during his incarceration.

Moreover, Zavalunov does not have a due process right to rehabilitative programs. It is well-settled that "inmates do not have a protected liberty interest in either RDAP participation or in the associated early release benefit." *Reeb v. Thomas*, 636 F.3d 1224, 1129 n. 4 (9th Cir. 2011), *citing Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1, 7, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979) (determining that a prisoner does not have a constitutional right to be released prior to the expiration of a valid sentence).

In *Moody v. Daggett*, the United States Supreme Court addressed the inmate's argument that "the pending warrant and detainer adversely affect[ed] his prison classification and qualification for institutional programs." 429 U.S. 78, 88 n. 9 (1976). The Supreme Court declined to grant relief for the denial of such benefits that are left to the "full discretion" of prison officials, and so the inmate had "no legitimate statutory or constitutional entitlement sufficient to invoke due process." *Moody*, 429 U.S. at 88 n. 9; *see Becerra v. Miner*, 248 F. App'x 368, 370 (3d Cir. 2007) (inmate assigned public safety factor of "deportable alien" had no liberty interest in his consequential disqualification for certain institutional programs).

Additionally, Zavalunov has no due process liberty interest in early release following completion of the RDAP. Pursuant to Section 3621(e), and as an incentive for a prisoner's successful completion of substance abuse treatment, "[t]he period a prisoner convicted of a nonviolent offense remains in custody after successfully completing a treatment program

29

may be reduced by the Bureau of Prisons, but such reduction may not be more than one

year from the term the prisoner must otherwise serve." 18 U.S.C. § 3621(e)(2)(B). To

complete the BOP treatment program, and therefore to become eligible for early release, an

inmate must complete all phases of the treatment program, including the community

treatment component which follows the unit-based residential treatment program. 28 C.F.R.

§§ 550.53, 550.55. As stated, pursuant to BOP policy, inmates with a detainer cannot

participate in the community treatment program and thus cannot be eligible for early

release. *See* BOP Program Statement 5331.02 § 7(a), BOP Program Statement 7310.04 §

10(f).

Zavalunov's inability to pursue early release due to his detainer does not implicate

his due process rights because he has no liberty interest in a sentence reduction under

Section 3621(e). *See Becerra*, 248 F. App'x at 370; *Hugel v. Bledsoe*, No. 08-1050, 2009

WL 1406252, at *4 (M.D. Pa. May 18, 2009). The Due Process clause itself does not create

a liberty interest in early release under Section 3621(e) because his classification as a

deportable alien and its resulting consequences of disqualification for certain rehabilitative

programs, including the early release benefit, "is not outside what a prisoner 'may

reasonably expect to encounter as a result of his or her conviction in accordance with due

process of law.'" *Becerra*, 248 F. App'x at 370 (citing *Fraise v. Terhune*, 283 F.3d 506, 522

(3d Cir. 2002) (citations omitted)). Nor does Section 3621(e) create a liberty interest,

30

because the determination whether to release a particular inmate is left to the discretion of the BOP.  *See* 18 U.S.C. § 3621(e)(2)(B); *Lopez v. Davis*, 531 U.S. 230, 241 (2001) ("When an eligible prisoner successfully completes drug treatment, the Bureau thus has the authority, but not the duty, both to alter the prisoner's conditions of confinement and to reduce his term of imprisonment.").  Because Zavalunov does not have a protectable interest in his prison classification, his qualification for rehabilitative programs, or early release, he cannot establish a constitutional deprivation as a result of the existence of the detainer.  Defendants are entitled to an entry of judgment in their favor on this claim.

### 6.    *Equal Protection Claim*

Zavalunov appears to argue that his equal protection rights were violated because his immigration status prevents him from participating in the RDAP and precludes him from early release eligibility.  (*See generally* Doc. 25).

Courts have consistently recognized that the exclusion of prisoners subject to ICE detainers from participating in BOP rehabilitative programs and receiving early release benefits does not violate the Equal Protection Clause.[2]  BOP regulations providing for such

---

[2]    The Fourteenth Amendment's Equal Protection Clause applies to the federal government through the Fifth Amendment's Due Process Clause.  *See Bolling v. Sharpe*, 347 U.S. 497 (1954); *Abdul-Akbar v. McKelvie*, 239 F.3d 307, 316 (3d Cir. 2001) (en banc).  "Aliens, even aliens whose presence in this country is unlawful, have long been recognized as 'persons' guaranteed due process of law by the Fifth and Fourteenth Amendments." *Plyler v. Doe*, 457 U.S. 202, 210 (1982).  To state an equal protection claim, "a plaintiff must at a minimum allege that he was intentionally treated differently from others similarly situated by the defendant and that there was no rational basis for such treatment." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 243 (3d Cir. 2008).

programs and benefits classify prisoners not as aliens and non-aliens, but as those having

ICE detainers against them and those who do not.  *See McLean v. Crabtree*, 173 F.3d

1176, 1185-86 (9th Cir. 1999); *Builes v. Warden Moshannon Valley Corr. Center*, 712 F.

App'x 132, 134 (3d Cir. 2017).

In reviewing an equal protection challenge to the BOP's classification of prisoners,

rational basis review is appropriate because the classification of prisoners by their eligibility

to participate in programs implicates neither a fundamental right nor a suspect class.

*Rublee v. Fleming*, 160 F.3d 213, 217 (5th Cir. 1998).  The Equal Protection Clause

requires only that the classification rationally further a legitimate state interest.  *See*

*Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992).

Applying rational basis review, excluding prisoners subject to detainers from

participating in programs involving custody issues, such as early release, is rationally

related to the BOP's legitimate interest in preventing such prisoners from fleeing.  *See, e.g.,*

*Adeyeye v. Department of Homeland Sec.*, 198 F. App'x 196, 197 (3d Cir. 2006) (finding "no

basis to question the regulation providing for the categorical exclusion of certain inmates

[from the early release incentive provided under the substance abuse program] . . . as a

legitimate exercise of the BOP's discretion" including prisoners subject to removal

detainers); *Gallegos-Hernandez v. U.S.*, 688 F.3d 190, 195-96 (5th Cir. 2012) (exclusion of

prisoners with ICE detainers from rehabilitative programs, or from halfway house placement,

did not violate the equal protection clause, since alien prisoners, as an identifiable group, were not treated differently from other similarly situated prisoners who were not aliens); *McLean*, 173 F.3d at 1185-86 ("excluding prisoners with detainers from participating in the community-based treatment programs, and consequently from sentence reduction eligibility, is at least rationally related to the BOP's legitimate interest in preventing prisoners from fleeing detainers while participating in community treatment programs.").  Additionally, the purpose of substance abuse rehabilitative programs is to reduce the likelihood of recidivism and drug abuse relapse and to reintegrate those inmates into society.  Since inmates with ICE detainers will be turned over for deportation after their release, limiting the program to those without detainers is a legitimate government interest.

As discussed above, Zavalunov remains ineligible for RDAP participation and its early release benefits based on his status as a deportable alien.  Zavalunov's ICE detainer, and the program limits associated with it, do not violate the Equal Protection Clause.  Defendants are entitled to an entry of judgment in their favor on this claim.

### 7.    *FOIA/ Privacy Act Claim*

Zavalunov asserts that Defendants withheld documents responsive to his FOIA request and that he suffered harm because the BOP failed to correct his inmate records.  The record reflects that the FOIA claim was properly processed and Zavalunov was provided with the requested documents.

On July 31, 2018, Zavalunov completed a FOIA request seeking only a copy of the ICE detainer dated October 16, 2017.  (Doc. 42 ¶¶ 33, 36).  On August 6, 2018, the BOP sent a determination letter releasing two pages of responsive documents.  (*Id.* at ¶¶ 34, 36).  The BOP redacted certain information and explained the exemptions that justified the redactions.  (*Id.* at ¶¶ 34, 36).  The determination letter advised Zavalunov that he had ninety (90) days to file an administrative appeal.  (*Id.* at ¶ 37).  Zavalunov did not appeal.  (*Id.* at ¶ 38).

Under the FOIA, an agency has a duty to conduct a reasonably adequate search for responsive records and the search must be reasonably calculated to uncover all responsive documents.  (*Id.* at ¶¶ 41-42).  The inquiry is whether the search for the documents was adequate, not necessarily whether there may be any other documents possibly responsive to the request.  (*Id.*).  To demonstrate the adequacy of the search, the agency must provide a reasonably detailed declaration setting forth the search terms and the type of searches performed.  (*Id.* at ¶ 43).  The FOIA declarant must be able to attest that all areas reasonably likely to contain responsive documents were searched and there are no remaining locations to search from which responsive documents are reasonably likely to be found.  (*Id.* at ¶ 44).  An agency must construe FOIA requests liberally and cannot limit its search to only some record systems if there are others that are likely to turn up the information requested.  (*Id.* at ¶ 45).

The record reflects that the Northeast Regional Office received Zavalunov's FOIA request on August 2, 2018. (*Id.* at ¶ 46). Also on August 2, 2018, the Northeast Regional office forwarded the request, *via* email, to LSCI-Allenwood requesting the documents. (*Id.*). In the request, Zavalunov asked for "[a] copy of the detainer request from the Immigration & Customs Enforcement on or about October 16, 2017." (*Id.* at ¶ 47; Doc. 46, p. 206). The next day, a case manager searched Zavalunov's Inmate Central File and found the requested document. (Doc. 42 ¶ 48). The BOP's FOIA Xpress database reflects that the record was forwarded for processing to a paralegal in the Office of Regional Counsel in Philadelphia. (*Id.* at ¶ 54). The request was processed, and, on August 6, 2018, the request was approved by a BOP attorney. (*Id.* at ¶ 55). On August 6, 2018, the determination letter and responsive records were sent to Zavalunov. (*Id.* at ¶ 56; Doc. 46, pp. 208-211). The undisputed evidence establishes that the FOIA claim was properly processed and Zavalunov was provided with the requested document.

Zavalunov also alleges that his BOP file is inaccurate and, thus, violates the Privacy Act for failure to maintain accurate files. "The Privacy Act 'governs the government's collection and dissemination of information and maintenance of its records [and] generally allows individuals to gain access to government records on them and to request correction of inaccurate records.'" *Kates v. King*, 487 F. App'x 704, 706 (3d Cir. 2012) (quoting *Perry v. Bureau of Prisons*, 371 F.3d 1304, 1304-05 (11th Cir. 2004)) (alteration in original). The

Act provides that, "'[w]henever any agency' fails to comply with any provision of the statute, 'the individual may bring a civil action against the agency.'"  *Kates*, 487 F. App'x at 706 (citing 5 U.S.C. § 552a(g)(1)).  The Privacy Act authorizes suit against federal agencies only and not individual employees of an agency.  *See Kates*, 487 F. App'x at 706.  To the extent that Zavalunov seeks to bring Privacy Act claims against the individually named Defendants, the amended complaint fails to state a claim against them.  Furthermore, the BOP has exempted its Central Record System from the Privacy Act's relevant enforcement provisions.  *See Kates*, 487 F. App'x at 707 (citing 28 C.F.R. § 16.97(a)).  Because Zavalunov's inmate Central File is maintained in a system of records that is exempt from the Privacy Act's amendment provision, the Court will grant Defendants' motion for summary judgment as to this claim.

## III.   Conclusion

The claims for damages against the individual Defendants in their official capacities will be dismissed as barred by sovereign immunity.  The Court will grant the motion for summary judgment with respect to the FTCA Claims, ICE Detainer Claims, and FOIA and Privacy Act Claims.  A separate Order shall issue.


Dated: April 28, 2020                    _s/ Robert D. Mariani_____
                                         Robert D. Mariani
                                         United States District Judge

36